**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RUDOLPH GREGORY SUROVCIK,<br>175 West Butternut Road<br>Hellertown, PA 18055,<br><br>Plaintiff,<br><br>v.<br><br>LEHIGH UNIVERSITY,<br>27 Memorial Drive West<br>Bethlehem, PA 18015;<br><br>JENNIFER K. RYAN, Ph.D.,<br>c/o Lehigh University<br>Bethlehem, PA 18015; and<br><br>ZACH G. ZACHARIA, Ph.D.,<br>c/o Lehigh University<br>Bethlehem, PA 18015,<br><br>Defendants. | Civil Action No. _______________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Allentown Division**<br><br>Northampton County |

**COMPLAINT**

Plaintiff Rudolph Gregory Surovcik, by and through his undersigned counsel, brings this action against Defendants Lehigh University, Jennifer K. Ryan, Ph.D., and Zach G. Zacharia, Ph.D., and in support thereof alleges as follows:

## I. NATURE OF THE ACTION

1. This case is about Lehigh University's coordinated response to a senior professional who refused to ignore documented institutional compliance violations, repeatedly reported those violations through Lehigh's own chain of command, and was then evaluated, stripped of benefits-eligible status, and subjected to review standards for a non-tenure track position that Lehigh never disclosed that were not applied equally to other job candidates. Plaintiff Rudolph Gregory Surovcik was 60 years old, had disclosed his own disabilities through Lehigh employment and ADA channels, and had a disabled adult daughter whose health coverage depended on Plaintiff's Lehigh-sponsored family plan. Lehigh nevertheless

conditioned his compensation, continued employment, and family healthcare coverage on corporate engagements that Lehigh's own policies barred him, as an adjunct instructor without written delegation, from executing lawfully. Lehigh then engaged in retaliatory activity and also redirected Plaintiff's commercial opportunity with Yancey's Fancy, Inc.

2. Plaintiff asserts claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (the "ADEA"); the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101–12213 (the "ADA"), including discrimination based on Plaintiff's own disability, associational disability discrimination under 42 U.S.C. § 12112(b)(4), retaliation under 42 U.S.C. § 12203(a), and interference under 42 U.S.C. § 12203(b); and Section 510 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140, enforced through 29 U.S.C. § 1132(a)(3). Plaintiff also asserts supplemental Pennsylvania claims under the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421–1428, and Pennsylvania common law for defamation and tortious interference with prospective contractual relations pursuant to 28 U.S.C. § 1367.

3. The claims pleaded herein are chronological and document-driven. Lehigh recruited Plaintiff in April 2025 to develop a corporate-funded Data Analytics Initiative ("DAI") within the School of Business with an institutional price goal of $35,000-$40,000 per project; Plaintiff warned in writing on May 17 and November 4, 2025 that external data engagements required approvals through the Office of General Counsel, Office of Research and Special Projects, and Lehigh University Contract Administration, plus compliance controls for data-governance, Family Educational Rights and Privacy Act, information-security, contract-template, and written delegation; Plaintiff further warned that his role, compensation, and written authority needed to be formally defined because he was an Adjunct and Lehigh's Signature Authority Policy and other applicable policies made it legally impossible for Plaintiff to act as an institutional contracting agent; Lehigh supplied none of these requirements; Lehigh then conditioned Plaintiff's December 9, 2025 Spring 2026 benefits-eligible workload on obtaining these external corporate projects; Plaintiff used personal equipment and private resources to propose several projects detailed below (Fragrance project; Highpoint project, and Yancey's Fancy Inc. projects); Dr. Ryan initially accepted then rejected the Fragrance project and determined that the Highpoint project was not timely; Dr. Ryan rejected the client-approved Yancey's Fancy, Inc. ("Yancey's Fancy") project on January 13, 2026; Dr. Ryan directed Plaintiff to provide the Yancey's Fancy proposal to Dr. Zacharia and Dr. Zacharia solicited the same client for $25,000 that evening through the Center for Supply Chain Research at Lehigh ("CSCRL"); Dr. Ryan then used the "failed-to-secure-projects" narrative in the Plaintiff's February 5, 2026 Non Tenure Track ("NTT") candidate file; Dr. Ryan and Dr. Zacharia each served on the NTT search committee that reviewed Plaintiff's candidacy.

4. Two documentary contradictions center on Dr. Ryan. The first is January 13, 2026: Dr. Ryan rejected the client-approved Yancey's Fancy projects for lack of clarity at approximately 3:30 p.m.; Plaintiff sent the proposal to Dr. Zacharia at 3:56 p.m. because Dr. Ryan instructed him to do so and Dr. Zacharia offered the same client a Spring project through Center for Supply Chain Research at Lehigh ("CSCRL") for $25,000 at 6:45 p.m. The second is February 4-5, 2026: on February 4, 2026, Dr. Malhotra signed a contract making "lead generation and meeting acquisition" Plaintiff's primary responsibility, with a target of "5-7 new corporate partnerships," while on February 5, 2026, Dr. Ryan recorded

in the context of the NTT search that Plaintiff had "failed to secure any projects for the spring semester before classes started" and that, "despite his industry experience," he had "struggled with the crucial skill of building relationships with companies and defining clear project scopes."

5. Plaintiff seeks back pay, front pay or reinstatement, restoration of the equitable value of lost benefits, liquidated damages for willful violation of the ADEA, compensatory damages where authorized, punitive damages on the state-law claims, declaratory and injunctive relief including correction and expungement of the false characterizations from the institutional candidate file, appropriate equitable relief under ERISA, relief under the Pennsylvania Whistleblower Law, prejudgment interest, and attorneys' fees and costs.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. § 1331 because they arise under the laws of the United States. Jurisdiction is also conferred by 29 U.S.C. § 626(c)(1) as to the ADEA claims; by 42 U.S.C. § 12117(a), incorporating 42 U.S.C. § 2000e-5(f)(3), as to the ADA claims; and by 29 U.S.C. § 1132(e)(1) and (f) as to the ERISA claim, which confer jurisdiction without regard to the amount in controversy or the citizenship of the parties.

7. This Court has supplemental jurisdiction over the Pennsylvania Whistleblower Law and common-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy. The state and federal claims arise from a common nucleus of operative fact: the same DAI authority and compliance warnings, the same January 13, 2026 rejection and redirection, the same February 5, 2026 NTT candidate-file statements, the same February and March 2026 internal complaint escalations to the Provost's office, the same July 2026 escalation to the Office of General Counsel, and the same denial of benefits-eligible employment.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Lehigh resides in this District within the meaning of 28 U.S.C. § 1391(c)(2); because the individual Defendants reside in or are employed in this District; and because a substantial part of the events and omissions giving rise to the claims occurred in Bethlehem, Northampton County, Pennsylvania. Venue for the ADA claims is independently proper under 42 U.S.C. § 2000e-5(f)(3), and for the ERISA claim under 29 U.S.C. § 1132(e)(2), because the plan is administered in this District, the alleged interference occurred here, and Lehigh resides and may be found here.

9. Assignment to the Allentown courthouse is appropriate because all parties reside or are located in Northampton County and because the events giving rise to this action occurred there.

10. Joinder of the individual Defendants is proper under Federal Rule of Civil Procedure 20(a)(2) because the claims against them arise out of the same transactions and occurrences as the claims against Lehigh and present common questions of law and fact. Joinder of all claims is proper under Federal Rule of Civil Procedure 18(a).

11. Pursuant to Local Civil Rule 5.1.1, Plaintiff does not plead a specific dollar amount of unliquidated damages. Plaintiff seeks both equitable relief and damages that Plaintiff believes exceed $150,000, exclusive of interest and costs. This action is therefore not eligible for compulsory arbitration under Local Civil Rule 53.2.

12. Pursuant to 29 U.S.C. § 1132(h), Plaintiff is serving a copy of this Complaint on the Secretary of Labor and the Secretary of the Treasury by certified mail.

## III. PARTIES

13. Plaintiff Rudolph Gregory Surovcik is an adult individual, now age 61, residing at 175 West Butternut Road, Hellertown, Northampton County, Pennsylvania 18055. He earned an M.B.A. from Lehigh University in 1989 and has more than thirty years of enterprise experience in data strategy, artificial intelligence governance, privacy compliance, and digital transformation. He was employed by Lehigh from 1995 to 2014, returned as a Visiting Lecturer in July 2023, and served as an Adjunct Instructor from August 2025 until July 2, 2026, in each case as a W-2 employee within the School of Business. He was an employee within the meaning of 29 U.S.C. § 630(f), 42 U.S.C. § 12111(4), and 29 U.S.C. § 1002(6), and a participant in Lehigh's employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(7).

14. Plaintiff's adult daughter cannot live independently and is an individual with a disability within the meaning of 42 U.S.C. § 12102. She was a student at Lehigh's Centennial School for five years. The Centennial School is licensed to provide educational services to students ages 6 through 21 with educational classifications of emotional disturbance and autism. She was covered as a dependent under Lehigh's employer-provided family health plan. Plaintiff therefore has a known relationship and association with an individual with a disability within the meaning of 42 U.S.C. § 12112(b)(4), and she is a beneficiary within the meaning of 29 U.S.C. § 1002(8). Plaintiff identifies her in this Complaint only as his adult daughter and omits her name and all protected health information.

15. Plaintiff also has documented physical and mental health disabilities of his own, which he disclosed to Lehigh through employment-application and ADA channels beginning in 2023 and again in connection with his 2024 and 2025 employment applications, Fall 2025 appointment materials, and November 16, 2025 NTT application. Those disclosures included protected-status and accommodation information and were preserved in his employee and application records. The precise medical conditions, functional limitations, and accommodation details are not pleaded publicly to protect Plaintiff's privacy, but they are reflected in records in Lehigh's possession and will be produced under appropriate confidentiality protections.

16. Defendant Lehigh University is a private, nonprofit institution of higher education with its principal place of business at 27 Memorial Drive West, Bethlehem, Northampton County, Pennsylvania 18015, and with its College of Business located at 621 Taylor Street, Bethlehem, Pennsylvania 18015. Lehigh employed twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year and is an employer within the meaning of 29 U.S.C. § 630(b). It employed fifteen or more such employees and is a covered entity within the meaning of 42 U.S.C. § 12111(2)

and (5). It sponsored and maintained an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) and (3).

17. Defendant Jennifer K. Ryan, Ph.D., is an adult individual who at all relevant times served as Frank L. Magee Professor and Department Chair for Decision and Technology Analytics ("DATA") within the School of Business at Lehigh, with a joint appointment in Industrial and Systems Engineering. She was Plaintiff's department chair, his counterpart on the Data Analytics Initiative, and a participant in the non-tenure-track faculty search that evaluated Plaintiff. She is named as a Defendant solely on the Pennsylvania common-law claims pleaded in Counts V and VI, for her own conduct.

18. Defendant Zach G. Zacharia, Ph.D., is an adult individual who at all relevant times served as Associate Professor in DATA and as Director of the Center for Supply Chain Research at Lehigh ("CSCRL"), and who chaired the non-tenure-track faculty search committee that evaluated Plaintiff. He is named as a Defendant solely on the Pennsylvania common-law claim pleaded in Count VI, for his own conduct.

19. At all relevant times Lehigh acted through its officers, administrators, and faculty, including Manoj K. Malhotra, Ph.D., the Kevin L. and Lisa A. Clayton Dean of the College of Business; Paul Brockman, Ph.D., Senior Associate Dean; Lawrence V. Snyder, Ph.D., Deputy Provost for Faculty Affairs; Nathan N. Urban, Ph.D., Provost and Senior Vice President for Academic Affairs; and Eric Zematis, Chief Information Security Officer. Each acted within the course and scope of his institutional role, and Lehigh is responsible for their acts and omissions. None is named as a Defendant.

## IV. ADMINISTRATIVE PREREQUISITES AND EXHAUSTION

20. On August 6, 2026, Plaintiff executed and filed EEOC Form 5, Charge of Discrimination No. 530-2026-07999, against Lehigh University ("Charge"). The Charge alleged discrimination on the basis of age, disability, and association with a person with a disability, and retaliation for protected activity, and stated that Plaintiff wanted the charge filed with both the EEOC and the appropriate state or local agency.

21. Pennsylvania is a deferral jurisdiction. The Charge was therefore timely under 42 U.S.C. § 2000e-5(e)(1), as incorporated by 42 U.S.C. § 12117(a), and under 29 U.S.C. § 626(d) and 29 C.F.R. § 1626.7, each of which permits filing within 300 days of the alleged unlawful practice. Each discrete adverse action pleaded in this Complaint occurred within 300 days of August 6, 2026, the earliest being the December 9, 2025 conditioning of Plaintiff's appointment and benefits.

22. On August 12, 2026, the EEOC issued a Determination and Notice of Rights. The Commission stated that it would not proceed further with its investigation and made no determination whether further investigation would establish a violation, expressly stating that this "does not mean the claims have no merit." The notice advised that any federal lawsuit must be filed within ninety days of Plaintiff's receipt of the notice.

23. Plaintiff received the Determination and Notice of Rights on or about August 12, 2026. This action is commenced within ninety days of that receipt and is therefore timely under

42 U.S.C. § 2000e-5(f)(1), 29 C.F.R. § 1601.28(e)(1), 29 U.S.C. § 626(e), and 29 C.F.R. § 1626.18.

24. More than sixty days elapsed between the filing of the Charge on August 6, 2026 and the commencement of this action, satisfying 29 U.S.C. § 626(d)(1) and 29 C.F.R. § 1626.18(b) as to the ADEA claims.

25. No administrative exhaustion is required for Plaintiff's claim under ERISA § 510, which is a statutory claim for interference rather than a claim for benefits due under the terms of a plan. Plaintiff asserts no claim in this action under 29 U.S.C. § 1132(a)(1)(B). No administrative exhaustion requirement applies to the Pennsylvania common-law claims pleaded in Counts V and VI or to the Pennsylvania Whistleblower Law claim pleaded in Count VII.

26. Plaintiff has satisfied all conditions precedent to the institution of this action.

.

## V. FACTUAL ALLEGATIONS

Some allegations are made on information and belief because the relevant records and communications are within Lehigh's possession, custody, or control. Those matters include internal search-committee deliberations, candidate-file access and distribution, witness interviews or lack of interviews, benefits-plan administration records, conflict disclosures, and internal communications concerning Plaintiff's complaints. Plaintiff pleads those facts based on the documents available to him, the chronology of events, and reasonable inferences from Lehigh's own records including governance policies publicly posted to Lehigh's website. Those facts will be confirmed in discovery. Except where expressly alleged on information and belief, Plaintiff alleges facts based on his personal knowledge, documents in his possession, communications he sent or received, and information reasonably obtained through prefiling investigation.

### A. Plaintiff's Background, Protected Status, and Qualifications

27. Plaintiff is 61 years old and is within the class protected by 29 U.S.C. § 631(a).

28. Across two tenures on the Lehigh faculty beginning in 1995, Plaintiff taught 143 Lehigh courses in data analytics, marketing analytics, digital strategy, database management, and related subjects. He received consistently positive teaching evaluations and was never subject to a written reprimand, performance-improvement plan, negative evaluation, or other adverse employment action before the events alleged here. These documents are maintained in Lehigh's records and these facts will be confirmed in discovery.

29. Plaintiff disclosed his own documented disabilities to Lehigh through its employment-application and ADA channels beginning in 2023, again in 2024, and again in 2025. The disclosures were in Lehigh's employment and application records and included protected-status and accommodation information. Plaintiff could perform the essential functions of the teaching, student-supervision, consulting-project, and NTT duties he held or sought, with or without reasonable accommodation, as shown by his 143 Lehigh courses, consistently positive evaluations, no adverse employment record, and the same corporate-development responsibilities Lehigh assigned to him in February 2026.

30. Plaintiff's adult daughter is disabled and cannot live independently. She was covered as a dependent under Lehigh's employer-provided family health plan. Maintaining benefits-eligible employment at Lehigh was therefore essential to the medical coverage of a family member with a disability.

### B. Lehigh Recruits Plaintiff to Build a Commercial Analytics Initiative

31. In April 2025, Dean Manoj K. Malhotra recruited Plaintiff to develop a Data Analytics Center and Data Analytics Initiative (the "DAI") within Lehigh's College of Business.

32. On April 24, 2025, at 10:05 p.m., Dr. Malhotra sent Plaintiff an email from his Lehigh account describing the model in detail. The email represented that companies would pay approximately $35,000 to $40,000 for analytics projects addressing their front-burner business problems; that students "will not get paid" but would provide the labor, performing the analytical work as part of an M.S.B.A. capstone; that project funds could support center personnel and expenses; that Plaintiff would use his corporate contacts to recruit and lead six or seven companies; that each project would be staffed by teams of four to five students mentored by Plaintiff and a client representative; that the principal constraint was marketing the center and securing clients; and that companies would be likely to return if they saved $100,000 to $150,000 on a project costing approximately $40,000.

33. The April 24, 2025 email identified no deficiency in Plaintiff's competence, experience, or professional relationships. It is a contemporaneous institutional document describing the duties Lehigh asked Plaintiff to perform and the commercial character of the initiative.

34. In reliance on those representations, Plaintiff accepted an intensive Fall 2025 appointment with five assigned courses and forwent private-sector opportunities.

35. Plaintiff repeatedly warned Lehigh in writing that the DAI was bypassing mandatory governance, exposing Lehigh to unresolved federal, state, and regulatory risks. Plaintiff warned that live third-party data engagements could not lawfully or responsibly proceed without formal institutional support and Lehigh policy compliance elements. On May 17, 2025, he warned Dr. Malhotra that the initiative required: senior leadership commitment, privacy and cybersecurity solutions, legal contracts, statements of work, risk and compliance review, approval chains, student onboarding, and project-continuity infrastructure. On November 4, 2025, he warned Dr. Ryan, with Dr. Malhotra copied, that corporate partners would also require visible institutional verification, formal University approval, and corporate legal, risk, and information security review before data-sharing or sponsorship discussions could proceed. Those warnings identified real institutional compliance defects, not post hoc grievances.

36. Plaintiff alleges upon information and belief that Lehigh never supplied the necessary elements. DAI was never formally chartered. It had no catalog listing, syllabus, registrar record, Office of Research and Sponsored Programs file, Office of General Counsel review, data-processing agreement, FERPA analysis, learning objectives, evaluation criteria, budget, dedicated web page, LinkedIn presence, business cards, institutional announcement, or comparable promotional resources. Lehigh nevertheless used DAI

performance as a measure of Plaintiff's compensation, benefits eligibility, and NTT candidacy when Plaintiff became a candidate for the NTT position.

37. On October 19 and 20 Plaintiff requested DAI business cards or permission to create DAI business cards for use at the 2025 CSCRL Fall Forum scheduled for November 5-6, 2025. On October 20, 2025, Dr. Ryan wrote that the business cards Plaintiff sought for the CSCRL Fall Forum should identify him only as an instructor or adjunct faculty member in DATA and should not use the official title of Data Analytics Initiative because she "would not want to cause any confusion among individuals who might Google for the Data Analytics Initiative at Lehigh and not find anything." The 2025 CSCRL Fall Forum brought more than 175 industry leaders to Lehigh on November 6-7, 2025, but Lehigh denied Plaintiff any DAI introduction, landing page, LinkedIn post, DAI business card, official title, or formal announcement. Lehigh withheld the tools needed for Plaintiff's performance condition.

38. Lehigh's Signature Authority Policy prohibits adjunct faculty from executing or finalizing contracts, confidentiality agreements, data-use agreements, or other commitments binding the University unless they have written delegated authority and required contract review. The policy applies to faculty and other employees, requires written delegation and review by Lehigh University Contract Administration and appropriate offices, states that unauthorized signers may be personally responsible, and requires Office of General Counsel, Purchasing, Office of Research and Special Programs, Risk Management, Controller, and Information Security Office/Library and Technology Information Security review depending on the subject matter. More specifically: Signature Authority Policy §1.2 states that acting without written delegation means acting outside the scope of employment, subject to discipline and personal liability; Signature Authority Policy §3.1 prohibits adjunct faculty from making binding commitments or representing the University without written delegation of authority; Signature Authority Policy §3.2 requires any delegation be in writing, specifying scope and time, and copied to the Office of General Counsel. Lehigh's policy further mandates that only authorized offices (Office of General Counsel, Purchasing, Office of Special Programs via Lehigh University Contracts Administration) negotiate contracts terms, only Vice Provosts/Assoc. Vice Provosts sign Non-Disclosure Agreements/Confidential Disclosure Agreements, Library and Technology Services oversees Data Use Agreements, and the President executes binding partnership agreements. Lehigh never granted Plaintiff written delegated authority, signature authority, or contracting authority to bind the University in any external industry engagement.

39. Lehigh thus tasked Plaintiff with generating paying corporate engagements for the University's benefit while withholding from him every institutional instrument required to market, scope, contract for, and lawfully execute such engagements, and while affirmatively concealing the initiative from public visibility.

### C. **The Fall 2025 Benefits-Eligible Appointment**

40. Plaintiff's Fall 2025 appointment, dated August 22, 2025, assigned him five courses and 12.5 credits, stated that the appointment required more than thirty hours per week, and rendered the appointment eligible for health care benefits under federal law and University policy. Plaintiff and his dependent daughter received coverage under Lehigh's family health plan during that appointment.

41. The five-course Fall 2025 load filled a structural vacancy created by a colleague's sabbatical. When that colleague returned for Spring 2026, Plaintiff's assignment was reduced to a level below the threshold for full-time status and benefits eligibility stripping him of employer-provided health coverage under federal law and Lehigh policy.

### D. **The NTT Position and the December 9, 2025 Conditioning of Benefits**

42. Lehigh posted the NTT Position on Wednesday, November 5, 2025. The published NTT description focused on teaching, student supervision, and the supervision of student consulting projects through existing departmental or CSCRL industry connections. It did not require a candidate personally to recruit paying corporate sponsors, generate consulting revenue, or define commercial project scopes. Plaintiff submitted his application for the NTT Position through Interfolio on November 16, 2025. During Fall 2025, Dr. Malhotra and Dr. Ryan had repeatedly instructed Plaintiff to concentrate on DAI, stated in words or substance that he had no chance at the NTT Position, and discouraged him from applying by telling him his future at Lehigh was through DAI. Plaintiff applied anyway for the NTT position.

43. The NTT Position was a benefits-eligible, full-time, renewable, fixed-term position with an initial three-year term and an anticipated July 1, 2026 start date. The posting stated that appointment at the Professor of Practice rank required extensive practical industry experience, ideally ten years or more, and a demonstrated track record of significant professional accomplishments. Plaintiff's November 16 application disclosed his 60-year age and other protected status and accommodations under the ADA, mirroring disclosures preserved in his Lehigh employment file from 2023 and 2024. These documents are maintained in Lehigh's records and these facts will be confirmed in discovery

44. On December 9, 2025, at 9:26:38 p.m. Eastern Standard Time — weeks after Plaintiff submitted his NTT application and renewed his ADA disclosures — Dr. Ryan wrote to Plaintiff that it was not appropriate to offer him a four-course Spring 2026 load; that Dr. Malhotra was not supportive of four courses "based on just the Yancey's Fancy project"; that a second project did not appear to be finalized; and that written project proposals setting out the problem description, data sets, company engagement, deliverables, and learning outcomes would be required before Dr. Malhotra would approve the arrangement.

45. The four-course load was the threshold for full-time status and eligibility for employer-provided family health coverage, a connection made explicit in the same email thread. By the December 9, 2025, 9:26:38 p.m. Eastern Standard Time email, Dr. Ryan and Dr. Malhotra linked Plaintiff's compensation, his contract, and his family's health benefits to the delivery of external corporate engagements. Those engagements required institutional recognition, contracting infrastructure, and delegated signature authority that Lehigh had

never provided and that its own Signature Authority Policy forbade Plaintiff, as an adjunct, to exercise. The condition was therefore one Lehigh had made impossible for Plaintiff to satisfy by lawful means.

### E. Development of DAI Projects

#### (1) Fragrance Pilot Study

46. On November 2, 2025, Plaintiff proposed using a proprietary data set owned by Plaintiff that no longer had commercial value and posed no data use risks or liabilities as a pilot test for DAI. This was consistent with Dr. Malhotra's June 19, 2025 email proposing a concept test for students.

47. Plaintiff provided to Dr. Ryan a pilot proposal for two student teams (one undergraduate, one graduate, 2 courses with 6 credits total) including an introduction, background and origin of data, purpose and pedagogical alignment, data governance and compliance plan, human research protection training, implementation plan for Spring 2026, and expected outcomes.

48. On November 4, 2025, Dr. Ryan expressed support for the two courses as a demonstration for companies that may be interested in sponsoring projects in the future.

49. On November 6, 2025, Dr. Ryan communicated that Dr. Malhotra instructed her that he wanted to meet with Plaintiff to discuss the proposal.

50. There were no further communications with Plaintiff from Dr. Ryan or Dr. Malhotra on the Fragrance Pilot proposal with two student courses.

#### (2) Highspring Project

51. Highspring is a global professional services, consulting, and talent solutions organization headquartered in Brentwood, Tennessee with office locations around the world. Between November and December 2025, Plaintiff worked with his pre-existing contacts at Highspring whose relationship with Plaintiff predated and were independent of Lehigh. Plaintiff developed a proposal with Highspring personnel for an MSBA capstone project. It was fully developed with a project and pedagogy plan but ultimately final approval was not given by Highspring's SVP of Sales.

52. On January 9, 2026, based upon internal referrals at Highspring, Highspring's CIO explained their positive prior experience with student capstone projects and expressed interest in scoping a project with Plaintiff for an upcoming semester.

#### (3) The Yancey's Fancy Engagement

53. Based upon discussions that began October 2025 and continued through January 9, 2026, Plaintiff developed a detailed analytics project for Yancey's Fancy, Inc. through direct communications with its Chief Executive Officer, Eric Cosnoski, a pre-existing professional contact of Plaintiff whose relationship with Plaintiff predated and was independent of Lehigh. The first project intended for Spring 2026 was to be a no-charge proof-of-concept and final deliverables and data specifications did not need to be locked before launch. The proposal contemplated that students would refine one of three problem areas under Plaintiff's guidance and Mr. Cosnoski's mentorship, and follow-on projects involving the other two problem areas would be paid engagements.

54. On January 8, 2026, at 4:02:55 p.m. Eastern Standard Time, Mr. Cosnoski confirmed that the proposal "look[ed] good," raised a data-security question about using Copilot rather than ChatGPT, and asked what was needed for approval on his side. On January 9, 2026, at 8:50 a.m., Plaintiff emailed Dr. Ryan with Mr. Cosnoski copied, confirming the Yancey's Fancy project and describing the project design, execution approach, and client-aligned selection criteria, including clarity. Dr. Ryan was therefore on written notice of the client's approval and the project's proposed feasibility-gate structure before the January 13 meeting. Mr. Cosnoski provided a Declaration dated November 10, 2026 pursuant to 28 U.S.C. § 1746 in support of Plaintiff's allegations.

### (4) January 13, 2026: Disclosure, Rejection, Redirection, and Solicitation

55. On January 13, 2026, at around 2:00 p.m., Plaintiff met with Dr. Ryan and Senior Associate Dean Paul Brockman in Dr. Brockman's office. During that meeting Plaintiff addressed the conditioning of his benefits on external corporate engagements without proper authorizations and institutional support. Plaintiff disclosed that his adult daughter was disabled, cannot live independently, and depends on his Lehigh-provided family health coverage. In response to Plaintiff's explanation of the family and benefits risk related to benefits conditioning, Dr. Ryan stated in words or substance, "I can't tell you how to manage your risks."

56. At 3:30 p.m. that same day, Dr. Ryan rejected the client-approved Yancey's Fancy proposal for purported lack of clarity and detail, notwithstanding the January 9 written confirmations from CEO Eric Cosnoski and feasibility-gate explanation in her possession. Dr. Ryan had four days to comment on the Yancey's Fancy project between January 9 and January 13 and no comments were provided before the rejection. Dr. Ryan later memorialized the rejection in an email dated Tuesday, January 13, 2026, at 9:19:24 p.m. Eastern Standard Time.

57. At 3:56 p.m. that same day, Plaintiff emailed the project materials to Dr. Zacharia at Dr. Ryan's direction, writing: "The DAI project I had confirmed has been put on hold. The project was for Yancey's Fancy. I am reaching out to Eric with the news. Jennifer wants to move the project to your center and do it next year." Dr. Zacharia was at that time both the chair of the NTT search committee evaluating Plaintiff for the NTT position and the director of CSCRL, the center through which he would later solicit the same client.

58. At 6:45 p.m. the same evening — approximately 169 minutes after Plaintiff's 3:56 p.m. transfer email and a little more than three hours after Dr. Ryan's 3:30 p.m. rejection — Dr. Zacharia sent a text message directly to Mr. Cosnoski stating, "I can do a spring project with CSCRL but it is 25K. Are you willing to pay for it?" Mr. Cosnoski forwarded that message to Plaintiff that night. Plaintiff pleads the $25,000 figure as a proposed fee and valuation and as an attempted solicitation. Plaintiff does not allege that any sale was completed, that Yancey's Fancy accepted the proposal, or that any funds were paid to Dr. Zacharia, CSCRL, or Lehigh.

59. Mr. Cosnoski abandoned the Yancey's Fancy project at Lehigh after Dr. Zacharia attempted to sell the same or substantially similar project back to him through CSCRL for $25,000. Cosnoski's contemporaneous messages stated that Dr. Zacharia "knew this as a proof of concept," that Dr. Zacharia was "dealing with Jennifer and Manoj," and that Dr. Zacharia had said "today was the deadline for Spring projects," which corroborates that the rejection, redirect, and solicitation were coordinated around the last opportunity to capture the project for Spring 2026.

60. On January 14, 2026, with Dr. Brockman present, Dr. Malhotra told Plaintiff in words or substance that he was "through at Lehigh" and that his "future isn't at Lehigh." That statement was made one day after Plaintiff's renewed disclosure that his adult daughter is disabled, cannot live independently, and depends on his Lehigh-provided family health coverage and his explanation of the family and benefits risk related to Lehigh's conditioning of benefits. At this time, Plaintiff's NTT application remained pending and the search had not concluded.

**(5) February 4 and 5, 2026: The Contract and the Contradicting Candidate File**

61. The Spring 2026 offer letter is dated February 4, 2026 and assigned Plaintiff responsibilities under a Corporate Partnership Development Initiative in addition to teaching two section of BIS-111. The DocuSign certificate reflects that the envelope was created on February 5, 2026, at 3:11:45 p.m. Eastern Standard Time, sent to Plaintiff at 3:14:55 p.m., viewed by Plaintiff at 3:19:03 p.m., and signed by Plaintiff on February 14, 2026, at 10:56:19 a.m. The offer letter made lead generation and meeting acquisition Plaintiff's primary responsibility and further assigned him executive outreach, target-company research, identification of high-level decisionmakers, initiating contact, and securing meetings, with success measured by the obtaining of five to seven new corporate partnerships.

62. On February 5, 2026, Plaintiff was interviewed by the NTT Position search committee via the Zoom platform. Zoom emailed the NTT interview meeting assets to Plaintiff at 12:24 p.m. Eastern Standard Time. Plaintiff alleges upon information and belief that after Plaintiff had disconnected from the Zoom interview, Dr. Ryan introduced for consideration of the NTT search committee unposted DAI-derived evaluation metrics and authored or ratified candidate debrief notes recording that Plaintiff had "failed to secure any projects for the spring semester before classes started" and that, "despite his industry experience," he had "struggled with the crucial skill of building relationships with companies and defining clear project scopes." The notes were captured by an artificial-intelligence

meeting-notes tool, which misidentified Plaintiff as "Eric." On information and belief, the notes were published to the NTT search committee members and were made available within the Plaintiff's candidacy file for review by all members of the voting faculty. Further investigation or discovery is needed to determine the extent of further publication to the Zoom distribution list, search committee membership, voting faculty under applicable access rules, Zoom/AI asset transmission metadata, candidate-file access logs, and evidence of continued use and further publication after Plaintiff's subsequent correction request.

63. Those statements treated as a candidate deficiency the very responsibilities Lehigh had assigned to Plaintiff in a written offer letter dated the preceding day. The phrase "despite his industry experience" framed Plaintiff's three decades of accumulated professional experience as diminishing rather than qualifying. The statements also supported an implication that decades of experience correlated negatively to age-related diminished capacity of a 60-year old candidate.

64. The statements were contradicted by Lehigh's own contemporaneous records, including the Spring 2026 offer letter dated February 4, 2026; Dr. Ryan's own November 4, 2025 endorsement of Plaintiff's Fragrance Analytics pilot, which rested on that same industry experience; the client-approved Yancey's Fancy engagement of which Dr. Ryan had written notice; and Chief Information Security Officer Eric Zematis's recognition of Plaintiff's knowledge as a "valuable asset" in connection with an invitation to Lehigh's privacy policy committee, on which Dr. Ryan and Dr. Malhotra were copied.

65. On February 5, 2026, at 2:03 p.m. Eastern Standard Time, Plaintiff sent Dr. Ryan a written correction request identifying the inaccurate characterizations and citing documentary support, including written CEO-level commitment from client Yancey's Fancy.

66. At 2:32:12 p.m. Eastern Standard Time — twenty-nine minutes later — Dr. Ryan responded. She stated that she had described Plaintiff's DAI experience because it was directly relevant to the position; that they had different interpretations; and that she would not debate the matter further, although Dr. Zacharia could add Plaintiff's email to the application file and share it with the NTT search committee. Dr. Ryan corrected several minor, non-substantive items in the record and refused in writing to correct the performance characterizations, thereby adopting them as her own.

67. Plaintiff alleges that commercial criteria applied to Plaintiff were absent from the published NTT Position description, were not disclosed to Plaintiff before his interview, were not shown to be essential functions of the posted position, and, on information and belief, were not applied to other candidates. Plaintiff alleges upon information and belief that the successful NTT candidate was Dr. Elioth Sanabria who was substantially younger than Plaintiff (more than 20 years younger and below the age of 40) with materially less prior teaching and enterprise consulting experience than Plaintiff. The selected candidate's exact age, qualifications, application materials, committee scoring, and selection rationale are in Lehigh's exclusive possession and will be sought in discovery.

### (6) Plaintiff's Protected Complaints and Lehigh's Refusal to Investigate

68. On February 8, 2026, Plaintiff formally documented his concerns to Assistant Provost Brockman regarding the NTT search, explaining that his prior DAI work was being incorporated into the search evaluation using criteria not stated in the posted job qualifications and against which no other candidate could reasonably have been assessed. Dr. Brockman responded that he was confident Dr. Zacharia would incorporate Plaintiff's concerns during the committee's discussions, and Dr. Zacharia responded that he would incorporate Plaintiff's concerns into the evaluation process. On information an belief Plaintiff alleges that despite those assurances, Lehigh did not correct the AI-generated performance summary and Dr. Ryan's characterizations, did not disclose Dr. Zacharia's $25,000 solicitation of Eric Cosnoski at Yancy's Fancy to the voting faculty, and did not apply required role-separation safeguards such as recusals and written disclosures of conflict of interest regarding Dr. Ryan and Dr. Zacharia.

69. On February 10, 2026, at 7:22:49 a.m. Eastern Standard Time, Plaintiff formally escalated a written complaint to the Office of the Provost, with drh514@lehigh.edu and Betty Rubio copied, seeking immediate review and interim relief for policy, authority and legal violations causing benefits and financial harm. The complaint explained that the outcomes on which his compensation and benefits had been conditioned could not lawfully be pursued without written delegated authority and formal contracting procedures. Deputy Provost Lawrence V. Snyder acknowledged receipt at 10:39 a.m. the same morning and stated that he would discuss the matter with the Provost.

70. On or before February 10, 2026, Plaintiff had been removed from candidacy for the NTT Position. On February 10, 2026, he received notice that the next round of NTT interviews would begin on February 28, 2026, and he was no longer included among the candidates proceeding in the search.

71. On March 10, 2026, at 9:59 a.m. Eastern Daylight Time, Plaintiff delivered to Dr. Snyder, with Provost Nathan N. Urban copied, an evidentiary package that included a memorandum addressing additional questions and concerns regarding the NTT search process and an exhibit set which included the original DAI solicitation, the Plaintiff's governance warnings, the NTT Position description, Plaintiff's requested correction correspondence, and Plaintiff's complaint regarding NTT candidacy criteria and loss of benefits.

72. On March 16, 2026, at 4:37:54 p.m. Eastern Daylight Time — six days after the March 10 submission — Dr. Snyder closed the review. He did not interview Plaintiff or take Plaintiff's statement. Plaintiff alleges upon information and belief that Lehigh whether through Dr. Snyder or other personnel, did not identify witnesses or conduct any witness interviews, issue written findings on the merits of the Plaintiff's reported policy and authority violations or allegations of legal violations, address the Signature Authority Policy issue, address the January 13 $25,000 solicitation of Eric Cosnoski at Yancey's Fancy by Dr. Zacharia, address the February 4/5 contradiction, or correct the NTT candidate file. Dr. Snyder wrote that Plaintiff may be alleging age and disability discrimination, referred Plaintiff to Lehigh's Equal Opportunity Compliance Coordinator, and stated that Plaintiff's allegations did not form the basis of an invalid faculty search.

### (7) Denial of the Position, Loss of Benefits, and Non-Renewal

73. In April 2026, Lehigh announced the selection of another candidate for the NTT Position. On information and belief, the successful NTT candidate was Dr. Elioth Sanabria who was substantially younger than Plaintiff (more than 20 years younger and below the age of 40) with materially less prior teaching and enterprise consulting experience than Plaintiff. The selected candidate's exact age, qualifications, application materials, committee scoring, and selection rationale are in Lehigh's exclusive possession and will be sought in discovery. Lehigh selected that candidate after applying to Plaintiff undisclosed DAI commercial-performance criteria that were absent from the NTT Position description and after preserving the false candidate-file statements by search committee member Dr. Ryan which were left uncorrected by search committee chair Dr. Zacharia. Plaintiff does not challenge Lehigh's choice of candidate but rather the discriminatory conduct of the NTT search as applied to Plaintiff.

74. Summer 2026 teaching assignments offered to Plaintiff arose from pre-existing and routine commitments, did not restore his full-time status, benefits eligibility, or NTT candidacy, and did not reflect any reconsideration of the actions alleged here.

75. On July 2, 2026, Plaintiff's teaching contract expired without renewal. Lehigh did not offer him a Fall 2026 contract, a benefits-eligible appointment, or continued employer-sponsored health coverage.

76. As a direct and proximate result of the conduct alleged, Plaintiff suffered lost wages and compensation, loss of employer-sponsored health coverage for himself and his dependent daughter, loss of other benefits of employment, injury to his professional reputation in both

management consulting and higher education, diminished future earning capacity, out-of-pocket costs to replace coverage and income, and emotional distress.

.

## VI. CLAIMS FOR RELIEF

### COUNT I
### AGE DISCRIMINATION IN VIOLATION OF THE ADEA
### 29 U.S.C. §§ 623(a), 626
### (Plaintiff v. Lehigh University)

77. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

78. Plaintiff was at least 60 years old at all relevant times and is a member of the class protected by 29 U.S.C. § 631(a). Lehigh is an employer within the meaning of 29 U.S.C. § 630(b).

79. Plaintiff was qualified for the NTT Position and for continued benefits-eligible employment. He had taught 143 Lehigh courses with consistently positive evaluations; Lehigh's Chief Information Security Officer had designated his knowledge a "valuable asset"; Ryan had endorsed his Fragrance Analytics pilot in November 2025; and Lehigh's February 4, 2026 Spring 2026 offer letter assigned him corporate-development responsibilities.

80. Lehigh discriminated against Plaintiff with respect to his compensation and the terms, conditions, and privileges of his employment, and failed or refused to hire him, because of his age, in violation of 29 U.S.C. § 623(a). The adverse actions include conditioning his Spring 2026 contract, compensation, and benefits eligibility on commercially impossible milestones; reducing his teaching load below the benefits-eligibility threshold without review; removing employer-provided health coverage; recording, publishing and refusing to correct false performance characterizations in his candidate file; removing him from NTT candidacy and denying him the position; and allowing his employment to end on July 2, 2026 without renewal.

81. The circumstances plausibly support the inference that age was the but-for cause of those actions. Lehigh recruited Plaintiff precisely for the corporate experience accumulated over a thirty-year career and then recharacterized that same experience as a deficiency, recording in his candidate file that he had struggled with relationship-building and project scoping "despite his industry experience." On information and belief, the successful NTT candidate was Dr. Elioth Sanabria who was substantially younger than Plaintiff (more than 20 years younger and below the age of 40) with materially less prior teaching and enterprise consulting experience than Plaintiff. Lehigh reversed its assessment of Plaintiff's client-development abilities without any intervening change in his performance; its Dean declared one day after the January 13, 2026 disclosure that Plaintiff was "through at Lehigh" while the search remained pending; and it selected the younger candidate after evaluating Plaintiff under criteria never published for the position.

82. The performance rationale Lehigh advanced is pretextual. The published NTT Position did not require the personal recruitment of paying corporate sponsors or the generation of consulting revenue. Lehigh assigned Plaintiff those duties outside the posted position while withholding the delegated authority required to perform them and while its own Signature Authority Policy forbade him to exercise such authority. The recorded statements that Plaintiff had "failed to secure any projects" and had "struggled" with relationship-building and scoping are contradicted by Lehigh's own documents, including the written Spring 2026 offer letter dated the day before those statements were recorded. These contradictions, inconsistencies, and implausibilities are such that a reasonable factfinder could disbelieve Lehigh's articulated reasons.

83. Lehigh's violation was willful within the meaning of 29 U.S.C. § 626(b). Its senior administrators received contemporaneous documentary notice of the policy violations, legal violations, pretexts, and contradictions; Deputy Provost Snyder acknowledged in writing that Plaintiff may be alleging age and disability discrimination; and Lehigh nonetheless closed its review in six days without interviewing Plaintiff or of information and belief any witness and permitted the disputed record to stand.

84. As a direct and proximate result, Plaintiff suffered lost wages, lost benefits including employer-sponsored health coverage, diminished future earning capacity, and continuing economic loss, and is entitled to back pay, front pay or instatement, restoration of benefits, liquidated damages, prejudgment interest, and attorneys' fees and costs.

**COUNT II**
**DISABILITY DISCRIMINATION AND ASSOCIATIONAL DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA**
**42 U.S.C. §§ 12112(a), 12112(b)(4), 12112(b)(5)(A), 12117**
**(Plaintiff v. Lehigh University)**

85. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

86. Plaintiff is a qualified individual with a disability within the meaning of 42 U.S.C. § 12111(8). He has documented physical and mental health conditions disclosed to Lehigh through employment applications and ADA channels in 2023, 2024, and 2025, and those disclosures included accommodation information. Plaintiff could perform the essential functions of his teaching, student-supervision, consulting-project, and NTT duties, with or without reasonable accommodation, as shown by his 143 Lehigh courses, consistently positive evaluations, lack of adverse employment history, client-approved Yancey's Fancy project pipeline, Highspring and Fragrance project pipeline, and the February 4, 2026 contract assigning him corporate-development responsibilities.

87. Lehigh had actual notice of Plaintiff's own disabilities and protected-status disclosures before the adverse actions alleged here. Lehigh's Human Resources and application systems preserved the 2023, 2024, and 2025 disclosures, and Plaintiff renewed protected-status and accommodation information in connection with the November 16, 2025 NTT application. Lehigh nevertheless applied undisclosed commercial-performance criteria to Plaintiff's NTT candidacy, conditioned his benefits-eligible employment on outcomes he

had warned he could not lawfully perform without institutional authority, and then used the resulting structural impossibility as a purported performance deficiency.

88. Lehigh further failed to engage in any good-faith interactive process after receiving Plaintiff's protected-status and accommodation disclosures in connection with the NTT application and his 2025 employment records. Instead of identifying the precise disability-related limitations and reasonable accommodations that would allow Plaintiff to compete on equal terms, Lehigh used unposted commercial metrics, denied institutional tools needed to satisfy those metrics, and preserved and published a false performance record that treated the resulting impossibility as Plaintiff's personal deficiency.

89. Plaintiff is separately protected under the ADA's association provision because his adult daughter has autism, cannot live independently, and was a dependent beneficiary under Lehigh's health plan. Plaintiff has a known relationship and association with her within the meaning of 42 U.S.C. § 12112(b)(4). Lehigh acquired actual knowledge of the severity and coverage-dependence of that association on January 13, 2026, at around 2:00 p.m., when Plaintiff disclosed those facts to Dr. Ryan and Senior Associate Dean Brockman, and Lehigh independently knew from its benefits records that Plaintiff's daughter was covered as a dependent under its plan.

90. At 3:30 p.m. that same day, Dr. Ryan rejected the client-approved Yancey's Fancy engagement — the very engagement on which, weeks earlier, she had conditioned the benefits-eligible course load. At 3:56 p.m., Plaintiff emailed the project materials to Dr. Zacharia, stating that Dr. Ryan wanted to move the project to Dr. Zacharia's center and do it the following year. At 6:45 p.m., Dr. Zacharia solicited the same client directly for a proposed $25,000 engagement through CSCRL for a Spring 2026 project. The following day, Dr. Malhotra told Plaintiff that he was "through at Lehigh." By February 10, 2026, Plaintiff had been removed from candidacy.

91. Lehigh thereafter denied Plaintiff the benefits-eligible NTT Position, selected a substantially younger candidate on information and belief, and allowed Plaintiff's employment and his family's health coverage to end on July 2, 2026. The May 1, 2026 summer teaching contract did not interrupt this causal sequence because it implemented pre-existing, enrollment-contingent summer commitments, did not restore benefits eligibility, and did not return Plaintiff to the NTT search.

92. Lehigh denied Plaintiff equal jobs and benefits because of his own disability and because of the known disability of an individual with whom Plaintiff is known to have a relationship or association. Lehigh's actions plausibly support the inference that Plaintiff's own age and disability status and his daughter's coverage-dependent disability were determining factors for Lehigh.

93. As a direct and proximate result, Plaintiff suffered lost wages, lost benefits including the coverage on which his daughter depended, out-of-pocket losses, and emotional harm, and is entitled to the remedies available under 42 U.S.C. § 12117(a) and 42 U.S.C. § 1981a.

## COUNT III
## RETALIATION IN VIOLATION OF THE ADEA AND THE ADA
## 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a-b)

**(Plaintiff v. Lehigh University)**

94. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

95. Plaintiff engaged in activity protected by 29 U.S.C. § 623(d) and 42 U.S.C. § 12203(a-b) by opposing practices he reasonably and in good faith believed to be unlawful. That protected activity includes his May 17, 2025 and November 4, 2025 emails warning Dr. Malhotra and Dr. Ryan that the DAI was bypassing mandatory governance, exposing Lehigh to unresolved federal, state, and regulatory risks; the February 10, 2026 written complaint to the Office of the Provost, with Human Resources copied, documenting the policy, authority, and legal violations causing benefits and financial harm; his March 10, 2026 delivery of his complaint and evidentiary package to Deputy Provost Snyder with Provost Urban copied; his August 6, 2026 EEOC Charge; and his transmittal of the August 6, 2026 EEOC Charge and supporting documents to the Office of General Counsel on July 13, 2026.

96. Lehigh had actual knowledge of that protected activity. Dr. Snyder acknowledged receipt of the February 10, 2026 complaint the same morning and stated that he would discuss it with the Provost. Dr. Snyder received the March 10, 2026 package directly, with the Provost copied. And Dr. Snyder expressly acknowledged in writing on March 16, 2026 that Plaintiff may be alleging age and disability discrimination.

97. Lehigh thereafter took actions that would dissuade a reasonable employee from making or supporting a charge of discrimination, including refusing to correct the false characterizations in Plaintiff's NTT candidate file; closing the internal review on March 16, 2026 within six days of receiving the evidentiary package, without interviewing Plaintiff or on knowledge and information any witness and without issuing findings; ratifying the tainted NTT search in writing; denying Plaintiff the NTT Position; and allowing his employment and health coverage to end on July 2, 2026 without renewal.

98. A causal connection is plausibly alleged by the close temporal sequence between each complaint and each adverse action; by Lehigh's refusal to correct a record it knew to be contradicted by its own documents; by the perfunctory six-day closure of Plaintiff's evidentiary submission to the Provost without any investigative step; and by Lehigh's shifting and inconsistent explanations for its treatment of Plaintiff.

99. As a direct and proximate result, Plaintiff suffered the economic and non-economic losses described above and is entitled to back pay, front pay or instatement, restoration of benefits, liquidated damages for willful violation of the ADEA, compensatory damages to the extent authorized under the ADA, prejudgment interest, and attorneys' fees and costs.

**COUNT IV**
**INTERFERENCE WITH BENEFIT RIGHTS IN VIOLATION OF ERISA § 510**
**29 U.S.C. § 1140, enforced through 29 U.S.C. § 1132(a)(3)**
**(Plaintiff v. Lehigh University)**

100. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

101. Lehigh's group health plan is an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1) and (3). Plaintiff was a participant in that plan and his adult daughter was a beneficiary, within the meaning of 29 U.S.C. § 1002(7) and (8).

102. Section 510 of ERISA makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under an employee benefit plan, or for the purpose of interfering with the attainment of any right to which the participant may become entitled under the plan.

103. Plaintiff was entitled to, and was entitled to attain, coverage under the plan upon holding a benefits-eligible appointment. His Fall 2025 appointment of five courses and more than thirty hours per week was benefits-eligible, and he and his dependent daughter were covered under the plan during that appointment.

104. Lehigh took the prohibited actions described below with the specific intent of interfering with the attainment of Plaintiff's rights under the plan. On December 9, 2025, Dr. Ryan declined to offer the four-course load that was the threshold for full-time status and benefits eligibility, and conditioned any such arrangement on the delivery of external corporate engagements through an initiative Lehigh had never chartered, funded, publicized, or empowered Plaintiff to execute, and which Lehigh's own Signature Authority Policy barred him from executing as an adjunct. Lehigh then reduced Plaintiff's Spring 2026 assignment below the benefits threshold without review or explanation and removed employer-provided health coverage from his Spring 2026 contract.

105. The condition Lehigh imposed was one it had made impossible for Plaintiff to satisfy by lawful means, as Plaintiff had warned Lehigh in writing on May 17 and November 4, 2025. A condition on benefits eligibility that the employer has made impossible to satisfy is not an incidental consequence of a staffing decision but a means of interference and a condition precedent the employer controlled and made unattainable.

106. After Plaintiff disclosed around 2:00 p.m. on January 13, 2026 that his dependent daughter's coverage under the plan depended on his benefits-eligible status, Lehigh did not relax the condition but escalated: at 3:30 p.m., Dr. Ryan rejected the client-approved engagement; at 3:56:20 p.m. Eastern Standard Time, Plaintiff emailed the project materials to Dr. Zacharia after stating that Dr. Ryan wanted to move the project to Dr. Zacharia's center; at 6:45 p.m., Dr. Zacharia solicited the same client for a Spring project through CSCRL; Lehigh declared Plaintiff's future at Lehigh at an end the next day, removed him from candidacy for the benefits-eligible NTT Position, denied him that position, and permitted his employment and coverage to lapse on July 2, 2026.

107. The proximity between Lehigh's acquisition of knowledge that a dependent with a disability relied on plan coverage and its escalating actions against Plaintiff's benefits-eligible status, the impossibility of the condition imposed, and the pretextual character of Lehigh's stated reasons together constitute circumstantial evidence from which specific intent to interfere with plan rights may be inferred.

108. Plaintiff seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including an injunction against continued violation of § 510, reinstatement to benefits-eligible status, restoration of plan participation for Plaintiff and his dependent, surcharge or other make-

whole equitable relief measured by the value of the lost coverage, and attorneys' fees and costs under 29 U.S.C. § 1132(g)(1). Plaintiff asserts no claim in this Count for benefits due under the terms of the plan under 29 U.S.C. § 1132(a)(1)(B).

**COUNT V**
**DEFAMATION AND DEFAMATION PER SE**
**42 Pa.C.S. § 8343**
**(Plaintiff v. Lehigh University and Jennifer K. Ryan, Ph.D.)**

109. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

110. On February 5, 2026, Dr. Ryan authored or ratified written statements in Lehigh's non-tenure-track faculty search record asserting that Plaintiff had "failed to secure any projects for the spring semester before classes started" and that, "despite his industry experience," he had "struggled with the crucial skill of building relationships with companies and defining clear project scopes."

111. The statements are defamatory in character. They ascribe to Plaintiff an incapacity to perform the central functions of his profession — securing client engagements, building corporate relationships, and scoping consulting projects — and are therefore actionable as defamation per se as words imputing a want of ability and unfitness in Plaintiff's business, trade, and profession.

112. The statements are assertions of verifiable fact, not opinion. Whether Plaintiff had secured a project for the Spring 2026 semester is a question of objective fact capable of proof or disproof, and Lehigh's own records answer it.

113. Dr. Ryan published the statements, and caused them to be published, to third persons other than Plaintiff, including the members of the non-tenure-track search committee, the faculty and administrators who participated in or reviewed the candidate evaluation, and the custodians of the official candidate file. The statements were recorded by an artificial-intelligence meeting-notes tool and transmitted and stored in institutional systems.

114. The statements applied to Plaintiff; he was the candidate they described. The recipients understood the statements to refer to Plaintiff and understood their defamatory meaning, namely that Plaintiff lacked a skill described to the committee as crucial to the position for which he was being considered.

115. The statements were false. Plaintiff had obtained the client-approved Yancey's Fancy engagement within the preceding month, and other projects prior, and Dr. Ryan had written notice of that approval because she was copied on the January 9, 2026 confirmation. Dr. Ryan had endorsed Plaintiff's Fragrance Analytics pilot on November 4, 2025 on the strength of the same industry experience. Lehigh's Chief Information Security Officer had designated Plaintiff's knowledge a "valuable asset." And the Spring 2026 offer letter dated the preceding day assigned Plaintiff the very corporate-development responsibilities the statements described as beyond his competence.

116. Dr. Ryan made and maintained the statements with knowledge of their falsity or with reckless disregard for whether they were true or false, and without the reasonable care a

publisher in her position owed. The documents contradicting the statements were in her own possession and had in part been sent to or by her. When Plaintiff presented those documents to her at 2:03 p.m. the same day, she corrected several minor, non-substantive items in the record and refused at 2:32 p.m. to correct the performance characterizations, thereby adopting them as her own and republishing them.

117. To the extent Defendants assert that the occasion was conditionally privileged, Plaintiff avers that any such privilege was abused and forfeited. Dr. Ryan published statements she knew or recklessly disregarded to be false; she acted from an improper purpose arising from her simultaneous and conflicting roles as department chair, DAI counterpart, and participant in the NTT search evaluating Plaintiff; she introduced unposted DAI-derived criteria after Plaintiff had disconnected from the interview and could not respond; she included unnecessary defamatory matter; she published beyond any legitimate institutional need; and she refused correction when presented with contrary documentation from Lehigh's own records.

118. Plaintiff suffered special harm as set forth above, including denial of the NTT Position, loss of benefits-eligible employment, and loss of employer-provided health coverage, and, the statements being defamatory per se, general damages are presumed and special damages need not be pleaded to establish liability, but Plaintiff suffered actual/general harm and pecuniary harm as separately pleaded.

119. Lehigh is vicariously liable for Dr. Ryan's publication, which occurred within the course and scope of her employment, and is independently liable because, after receiving Plaintiff's February 5, 2026 correction request, his February 10, 2026 complaint, and his March 10, 2026 complaint and evidentiary package, and July EEOC Charge package, Lehigh ratified the statements and permitted their continued publication and institutional use.

120. As a direct and proximate result, Plaintiff suffered injury to his reputation in both management consulting and higher education, personal humiliation, mental anguish, loss of standing in his profession and in the academic community, and pecuniary loss. Defendants' conduct was outrageous and undertaken with reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS
**(Plaintiff v. Jennifer K. Ryan, Ph.D., Zach G. Zacharia, Ph.D., and Lehigh University)**

121. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

122. A prospective contractual and economic relation existed between Plaintiff and Yancey's Fancy, Inc. Plaintiff had a pre-existing professional relationship with its Chief Executive Officer, Eric Cosnoski, which predated and was independent of Lehigh; he developed a detailed analytics project for the company between October 2025 and January 2026 with project details (initial stage-gate project then two follow on projects) scoped between

January 6 and January 9, 2026; and Cosnoski confirmed at 4:02:55 p.m. Eastern Standard Time on January 8, 2026 that the proposal "look[ed] good" and asked what was needed for approval on his side. There was an objectively reasonable likelihood, and not a mere hope, that the relation would be consummated.

123. Dr. Zacharia knew of that prospective relation. He received Plaintiff's Yancey's Fancy project materials on January 13, 2026 at Ryan's direction, knew that Plaintiff had developed the project through a pre-existing relationship with Cosnoski, and knew that the project had been structured as a proof-of-concept pilot rather than a paid CSCRL engagement. Cosnoski's contemporaneous messages state that Dr. Zacharia knew the particulars of the proposal and knew it was a proof of concept.

124. Dr. Zacharia took purposeful action specifically intended to prevent the relation from being consummated. At 6:45 p.m. on January 13, 2026, approximately 169 minutes after Plaintiff's 3:56:20 p.m. Eastern Standard Time transfer email, Dr. Zacharia sent a text message directly to Cosnoski proposing that CSCRL could perform a Spring project for $25,000, thereby seeking to substitute his own center for Plaintiff in the engagement Plaintiff had created.

125. Dr. Ryan took purposeful action to the same end by rejecting the client-approved proposal at 3:30 p.m. on January 13, 2026, and by causing the project materials to be transferred to Dr. Zacharia at 3:56:20 p.m. Eastern Standard Time, notwithstanding that she had no authority over Plaintiff's independent professional relationship with Eric Cosnoski or Yancey's Fancy.

126. The conduct of Dr. Ryan and Dr. Zacharia was not privileged or justified. In soliciting Plaintiff's client for the benefit of his own center, Dr. Zacharia acted outside the scope of any legitimate institutional role and for the commercial benefit of CSCRL and his own professional interest, including his interest as chair of the NTT faculty search then evaluating Plaintiff. Dr. Ryan acted outside the scope of any legitimate role in redirecting a client relationship she did not control. The project had been developed through Plaintiff's own pre-existing relationship; Lehigh had never chartered the DAI, provided contracting authority, or supplied any institutional resource necessary to the project; and Lehigh had affirmatively directed that the initiative not be made publicly findable. The conduct contravened the rules of the trade and ordinary standards of fair dealing among professionals.

127. As a direct and proximate result, Plaintiff suffered actual legal damage, including the loss of the prospective Yancey's Fancy engagement and its value, the loss of the compensation and benefits eligibility that engagement would have supported under the condition Lehigh had imposed on December 9, 2025, injury to his standing with a longstanding professional contact, and the loss of additional consulting opportunities with Yancey's Fancy over several anticipated projects as indicated in the declaration of Cosnoski.

128. Lehigh is liable for the conduct of Dr. Ryan and Dr. Zacharia to the extent undertaken within the course and scope of their employment, and independently by reason of its ratification of that conduct when, with full documented notice, it declined to investigate or correct it.

129. The conduct of Dr. Ryan and Dr. Zacharia was outrageous and undertaken with reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages.

**COUNT VII**

**RETALIATION IN VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW**

**43 P.S. §§ 1421–1428**

**(Plaintiff v. Lehigh University)**

130. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

131. At all relevant times, Lehigh was an employer within the meaning of the Pennsylvania Whistleblower Law. Lehigh is a Pennsylvania nonprofit corporation. Plaintiff alleges upon information and belief that Lehigh received money from Commonwealth and political-subdivision sources, and from public pass-through sources, to perform work or provide services relative to work for or services to public bodies. Plaintiff alleges that Lehigh's FY2023 audited financial statements reported $7.994 million in state and local grants and contracts; Lehigh's FY2024 audited financial statements reported $9.902 million in state and local grants and contracts; its FY2025 single-audit reporting package reported $8.740 million in state and local grants and contracts. On information and belief, Lehigh continued to receive Commonwealth, political-subdivision, state, local, and pass-through public money during the 2025–2026 period. The exact awards, contracts, ledgers, scopes of work, public-purpose restrictions, and pass-through documents are in Lehigh's possession and will be the subject of discovery.

132. Plaintiff alleges upon information and belief that at all times relevant to the following claims, Lehigh University accepted significant funding from the Commonwealth of Pennsylvania within the School of Business. Lehigh works in explicit partnership with Ben Franklin Technology Partners of Northeastern Pennsylvania (BFTP/NEP). BFTP/NEP operates its primary startup incubator facilities—most notably Ben Franklin TechVentures—directly on Lehigh University's Mountaintop Campus. BFTP/NEP is a state-supported economic development organization primarily funded through the Pennsylvania Department of Community and Economic Development (DCED) and the Ben Franklin Technology Development Authority (BFTDA). The state budget channels millions to this entity, which works in explicit structural partnership with Lehigh. In turn, BFTP/NEP passes state revenue through the Lehigh university ecosystem via research contracts, wet lab operations, and local manufacturer resource grants, including programs administered through the School of Business. Lehigh also accepts state funds to operate a regional Pennsylvania Small Business Development Center (SBDC) through the Lehigh School of Business, financed in part through DCED state line-item appropriations to foster regional commercial development. Lehigh also has accepted funding through state-level higher education assistance programs including the Pennsylvania Higher Education Assistance Agency (PHEAA). Lehigh also accepts state funds to operate The Centennial

School which is a highly specialized state-governed and publicly funded special education facility operated by Lehigh University's College of Education. The exact awards, contracts, ledgers, scopes of work, public-purpose restrictions, and pass-through documents are in Lehigh's possession and will be the subject of discovery.

133. Plaintiff alleges on information and belief that Lehigh University's Ethics & Compliance Policy explicitly states it "expects its employees to perform their duties in accordance with applicable laws and regulations, University policy and procedures, and the highest ethical standards." The action taken by NTT search committee chairman Dr. Zacharia—interfering with a private consulting project to divert it and sell it through a university center for $25,000—directly breaches Lehigh's strict business and academic conflict guidelines. Plaintiff also alleges on information and belief that Lehigh broadly defines a Conflict of Interest as any relationship, consulting activity, or economic interest that "may influence the exercise of their professional judgment on behalf of the University." Under the Lehigh Conflict of Interest Policy, personnel are strictly prohibited from abusing their university title, committee authority, or institutional access to enrich themselves, their specific university centers, or to cause commercial harm to external entities doing business with community members. While the university has a Professional Consulting Policy allowing external engagements, it explicitly dictates that such actions must not create a conflict of interest, must not utilize university resources unlawfully, and must remain completely ethical.

134. Plaintiff was an employee within the meaning of the Pennsylvania Whistleblower Law because he performed services for wages or other remuneration under written or implied contracts of hire with Lehigh. Plaintiff was employed by Lehigh within the School of Business as a Visiting Lecturer and Adjunct Instructor, was paid through Lehigh payroll, and received employee benefits when his appointment satisfied Lehigh's benefits-eligibility criteria.

135. Before the reprisals, Plaintiff made multiple good-faith reports, verbally and in writing, to Lehigh supervisors and agents concerning wrongdoing and, in the alternative, waste. Those reports included: (a) his May 17, 2025 written communication to Dean Malhotra identifying authority, legal, risk, compliance, cybersecurity, contract, statement-of-work, approval-chain, and student-onboarding requirements needed to operationalize the DAI and to receive compensation for projects; (b) his November 4, 2025 written communication to Dr. Ryan, with Dr. Malhotra copied, explaining that corporate partners would require visible institutional verification in accordance with Lehigh policies including but not limited to formal University approval, and corporate Legal, Risk, and Information Security review before data-sharing or sponsorship discussions could proceed; (c) his February 10, 2026 complaint to the Provost's Office and Human Resources seeking immediate review and corrective action for policy, authority and legal violations that directly affected appointment structure, benefits eligibility, and compensation and that made compensation and benefits depend on outcomes that could not lawfully be pursued without written delegated authority and formal contracting procedures; (d) his March 10, 2026 evidentiary package to Dr. Snyder, with Provost Urban copied, documenting the DAI history, compliance requirements, benefits conditioning, NTT process defects, and related adverse

actions through an indexed exhibit set; (d) his further escalation to the Office of General Counsel including the EEOC Charging package on July 13, 2026.

136. Plaintiff made those reports without malice and with reasonable cause to believe they were true. His reports were grounded in Lehigh's own written policies, his professional experience in enterprise data governance and compliance, his direct communications with Lehigh administrators, and the contemporaneous validation of his domain expertise by Lehigh's Chief Information Security Officer and Data Protection Officer, who described Plaintiff's knowledge as a valuable asset to Lehigh's privacy-policy work.

137. The wrongdoing Plaintiff reported was not merely technical or minimal. Plaintiff reported that Lehigh was conditioning his compensation, benefits eligibility, NTT search evaluation, and continued employment on external corporate engagements that Lehigh had not lawfully or institutionally enabled him to pursue, because Lehigh had not supplied written delegated authority, LUCA routing, Office of General Counsel review, Office of Research and Sponsored Programs review, information-security review, data-use and confidentiality documentation, conflict review, or other required approval chains.

138. Lehigh's Signature Authority Policy and contract-review procedures were codes of conduct or ethics designed to protect Lehigh, its employees, external partners, students, and the public-facing integrity of institutional commitments. The policy states that its purpose is to safeguard University resources and minimize financial, legal, operational, and compliance-related risks by establishing authority and responsibilities for reviewing and executing agreements. Those procedures required written delegation of authority, advance review and approval of contracts, routing through LUCA, and review by the Office of General Counsel, Purchasing, ORSP, Risk Management, Controller, and LTS Information Security where appropriate, so that contract terms, legal risk, and compliance with federal, state, local, and University requirements would be documented and evaluated before Lehigh became obligated or exposed to risk.

139. Plaintiff's reports also identified conduct that, if proven, constituted or would necessarily require nontechnical violations of applicable statutes, regulations, or qualifying compliance codes governing institutional contracting, student and third-party data, FERPA and privacy review, information security, student labor, non-profit status, conflicts of interest, sponsored-program routing, and the use of University resources in industry-facing engagements. Plaintiff does not plead a free-standing private cause of action under each such law in this Count; he pleads that his reports identified wrongdoing within the meaning of 43 P.S. § 1422 because the reported conduct concerned nontechnical legal and compliance violations or qualifying codes designed to protect the public and Lehigh.

140. In the alternative, and on information and belief, Plaintiff's reports concerned waste within the meaning of the Pennsylvania Whistleblower Law to the extent Lehigh used, risked, misapplied, or diverted Commonwealth-derived, political-subdivision-derived, state or local grant, contract, facility, personnel, student, administrative, information-technology, or other publicly supported resources in connection with DAI or CSCRL external corporate engagements without the required authority, approvals, controls, or review. The precise source, restriction, and accounting treatment of those resources are within Lehigh's possession and will be the subject of discovery.

141. Lehigh had actual knowledge of Plaintiff's good-faith reports. Dr. Malhotra received the May 17, 2025 report. Dr. Ryan and Dr. Malhotra received the November 4, 2025 report. The Provost's Office, Human Resources, Dr. Snyder, and Provost Urban received or were copied on the February 10 and March 10 2026 reports. Dr. Snyder acknowledged the February 10, 2026 complaint the same morning, later acknowledged that Plaintiff may be alleging age and disability discrimination, and closed the review without interviewing Plaintiff and on information and belief Plaintiff alleges without interviewing witnesses, issuing findings on policy violations, or correcting the candidate file. The Office of General Counsel received the EEOC Charging package on July 13, 2026.

142. Because of Plaintiff's good-faith reports and because he was about to continue reporting and supporting those reports, Lehigh discharged, threatened, discriminated, and retaliated against Plaintiff regarding his compensation, terms, conditions, and privileges of employment. The retaliatory actions included, without limitation, conditioning his Spring 2026 benefits-eligible workload on impossible and unauthorized DAI outcomes after his May and November 2025 reports; using unposted DAI performance criteria against him in the NTT search; preserving and refusing to correct false performance characterizations; soliciting Plaintiff's client Eric Cosnoski and Yancey's Fancy for the benefit of Dr. Zacharia's own CRCSL center; closing the internal review without investigation; ratifying the tainted search record; denying him the benefits-eligible NTT Position; and allowing his employment and employer-provided health coverage to end on July 2, 2026 without renewal.

143. A causal connection is plausibly alleged by concrete facts and surrounding circumstances, including that the adverse actions targeted the same DAI authority and compliance issues Plaintiff had reported; that Lehigh used DAI performance as an evaluation criterion after Plaintiff had reported the absence of the authority and infrastructure necessary to perform it lawfully; that Lehigh conditioned benefits eligibility on the very corporate engagements Plaintiff had warned could not be pursued without delegated authority and contracting infrastructure; that Dr. Snyder closed the review six days after receiving Plaintiff's evidentiary package; and that Lehigh offered no non-pretextual explanation reconciling the February 4, 2026 Spring 2026 offer letter assigning corporate partnership duties with the February 5, 2026 NTT candidate-file statement that Plaintiff could not perform those same duties.

144. Lehigh cannot prove that the actions described in this Count occurred for separate and legitimate reasons that were not merely pretextual. Lehigh's asserted performance rationale is contradicted by its own documents, by Plaintiff's written compliance warnings, by the client-approved Yancey's Fancy engagement, by the Fragrance project and Highspring pipeline, by Lehigh's CISO's validation of Plaintiff's expertise, and by Lehigh's refusal to take any ordinary investigative step after receiving the February 10, 2026 complaint and the March 10, 2026 complaint and evidentiary submission.

145. This Count is timely. The latest retaliatory adverse action pleaded in this Count occurred on July 2, 2026, when Lehigh allowed Plaintiff's teaching contract, employment, and employer-provided health coverage to end without renewal. One hundred eighty days from July 2, 2026 is December 29, 2026. This action is filed within that period. As a direct and proximate result of Lehigh's violations of the Pennsylvania Whistleblower Law, Plaintiff

suffered lost wages, lost benefits, loss of employer-provided health coverage, loss of employment opportunities, reputational harm, emotional distress, and other actual damages. Plaintiff is entitled to appropriate injunctive relief and damages, including reinstatement or instatement, back pay, full reinstatement of fringe benefits and seniority rights, actual damages, litigation costs, reasonable attorneys' fees, witness fees, and all other relief available under 43 P.S. §§ 1424 and 1425.

## VII. RESERVATION OF CLAIMS

146. Plaintiff asserts no claim in this action under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq. Plaintiff's EEOC Charge requested filing with the appropriate state agency. The Pennsylvania Human Relations Commission has not dismissed the complaint, closed its file, or notified Plaintiff of a right to bring a private action, and one year has not elapsed since the filing of the Charge on August 6, 2026. Plaintiff's PHRA claims are therefore not yet ripe under 43 P.S. § 962(c). Plaintiff expressly reserves all claims arising under the Pennsylvania Human Relations Act, including claims under 43 P.S. § 955(a), (d), (e), and (l), and will seek leave to amend to assert them upon satisfaction of the statutory conditions.

---

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rudolph Gregory Surovcik respectfully requests that this Court enter judgment in his favor and against Defendants and grant the following relief:

a. Declare that Lehigh University's conduct violated the ADEA, the ADA, and ERISA § 510;

b. Enjoin Lehigh University from further discrimination, retaliation, interference, and coercion against Plaintiff, and from continued reliance on the false statements in his candidate file and employment records;

c. Order Lehigh University to correct and permanently expunge from the non-tenure-track search record, the institutional candidate file, and Plaintiff's employment records the false performance characterizations identified in this Complaint;

d. Order instatement to a benefits-eligible faculty position or, in lieu thereof, award front pay;

e. Award back pay, lost compensation, and the value of lost benefits, including employer-provided health coverage for Plaintiff and his dependent, together with the cost of replacement coverage;

f. Award liquidated damages under the ADEA for willful violation, pursuant to 29 U.S.C. § 626(b);

g. Award compensatory damages, including for emotional distress, reputational harm, and diminished future earning capacity, to the extent authorized under the ADA and 42 U.S.C. § 1981a and under Pennsylvania law;

h. Award appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including reinstatement of benefits-eligible status, restoration of plan participation for Plaintiff and his dependent, and surcharge or other make-whole equitable relief measured by the value of the lost coverage;

i. Award compensatory and punitive damages against Defendants Dr. Ryan and Dr. Zacharia, and against Lehigh University, on Counts V and VI;

j. Award appropriate relief under the Pennsylvania Whistleblower Law, including reinstatement or instatement, back pay, full reinstatement of fringe benefits and seniority rights, actual damages, litigation costs, reasonable attorneys' fees, witness fees, and all other statutory relief;

k. Award prejudgment and post-judgment interest;

l. Award reasonable attorneys' fees, expert fees, and costs under 29 U.S.C. §§ 626(b) and 1132(g)(1) and 42 U.S.C. §§ 12117(a) and 12205; and

m. Grant such other and further relief as the Court deems just and proper.

In accordance with Local Civil Rule 5.1.1, Plaintiff does not plead a specific dollar amount of unliquidated damages. Plaintiff seeks equitable relief and damages that Plaintiff believes exceed $150,000, exclusive of interest and costs, and this action is therefore not eligible for compulsory arbitration under Local Civil Rule 53.2.

## IX. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 10, 2026

Respectfully submitted,

**POTOMAC LAW GROUP, PLLC**

/s/ *David DeSalle*
David DeSalle, Esquire
Pa. I.D. No. 76551
Potomac Law Group, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
240-994-8830 | ddesalle@potomaclaw.com

Attorney for Plaintiff
Rudolph Gregory Surovcik